**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**CENTRAL DIVISION**

| | |
|---|---|
| In re:<br><br>DEBRA ANN DUNBAR<br><br>Debtor<br><br>LEOMINSTER HOUSING AUTHORITY<br><br>Plaintiff<br><br>v.<br><br>DEBRA ANN DUNBAR<br><br>Defendant | Chapter 13<br>Case No. 11-40880-MSH<br><br><br><br><br><br>Adversary Proceeding<br>No. 11-4066 |

**MEMORANDUM OF DECISION AND ORDER ON MOTION OF LEOMINSTER HOUSING AUTHORITY FOR SUMMARY JUDGMENT**

Plaintiff, Leominster Housing Authority ("LHA"), the former landlord of the defendant and debtor in the main case, Debra Ann Dunbar, seeks summary judgment on its complaint which alleges that the debt owed to it by Ms. Dunbar for underpayment of rent is nondischargeable pursuant to Bankruptcy Code § 523(a)(2)(A) and (B), (11 U.S.C. § 101 et seq.).  While admitting many of LHA's factual allegations, Ms. Dunbar opposes summary judgment on the grounds that a trial is required as to the issue of her intent to deceive.

**Facts**

The following undisputed facts are taken from the Statement of Agreed Facts in the parties' Joint Pretrial Memorandum, the facts in the complaint which Ms. Dunbar has admitted, the

1

attachments to the complaint referenced in those admitted facts, the affidavits filed by LHA in support of its motion for summary judgment and the exhibits attached to those affidavits.

On August 17, 2000 Ms. Dunbar entered into a lease (the "Lease") with LHA[1] for the rental of an apartment in a public housing complex located in Leominster, Massachusetts. Ms. Dunbar testified at her deposition that she did not read the Lease before signing it. Ms. Dunbar had previously lived in other public housing managed by LHA. The Lease listed Ms. Dunbar and her two sons, Takai and Tremain, as household members. With the exception of certain excludable income,[2] Ms. Dunbar's rent was based on the household's gross monthly income which amount Ms. Dunbar provided to LHA. Ms. Dunbar also authorized LHA to obtain independent verification of her reported household income through the Massachusetts Department of Revenue's wage match, tax match and/or bank match systems although Cindy Driscoll, Director of Resident Services for LHA, stated in her affidavit that it had been her experience that the wage match system "is at least six months behind in its information."

The amount of Ms. Dunbar's rent was subject to annual redetermination. In accordance

---

[1] The parties agree that LHA, which the complaint describes as the "owner" of the public housing apartment leased to Ms. Dunbar, is a public body politic created by the Commonwealth of Massachusetts. LHA is a local housing authority created pursuant to Mass. Gen. Laws ch. 121B, § 3 to exercise certain powers enumerated in chapter 121B. The Department of Housing and Community Development is charged with adopting regulations setting the guidelines under which the local housing authorities operate. Mass. Gen. Laws ch. 121B, § 29.

[2] Although neither party cited the regulations promulgated by the Department of Housing and Community Development, section IV of the Lease states that "LHA shall redetermine Tenant's monthly rent, once annually in accordance with the applicable regulations or authorization of the Department of Housing and Community Development." Among funds excluded from a household's applicable income are the "[w]ages and/or salary earned by a full-time student, as defined [in the regulations], or by an unemancipated minor." 760 Code Mass. Reg. 6.05(3)(k).

2

with the Lease and LHA's procedures, in or around February of each year, Ms. Dunbar submitted a statement, sworn to under the pains and penalties of perjury, called an Application for Continued Occupancy in which she detailed the members of her household and the employment status and amount of income for each member.  According to Ms. Dunbar when it was time for her annual rent review, she would ask her son, Takai, for his last four paystubs and would provide them, along with her own four most recent paystubs, to LHA.  Ms. Dunbar testified at her deposition that after she provided the paystubs to an LHA employee, identified as Elaine Shattuck, Ms. Shattuck would calculate the amount of rent to be paid by Ms. Dunbar.  After Ms. Shattuck completed her calculations, Ms. Dunbar testified that she would return to LHA's office where she sat with Ms. Shattuck and "filled out the papers."  Ms. Dunbar's annual disclosure of employment and income was subject to independent verification by LHA through the match system.

The composition of her household was also subject to annual certification by Ms. Dunbar in order to determine her continued eligibility for the size apartment she was renting.[3]  The Lease required Ms. Dunbar to notify LHA if any member of her household listed on the Lease no longer resided in the apartment.[4]  Included among the papers which Ms. Dunbar signed as part of the annual recertification process were annual addenda to the Lease.  According to the 2008, 2009 and 2010 addenda to the Lease, Ms. Dunbar's household consisted of herself and Takai.  Her

---

[3] The Lease describes the apartment as a three-bedroom apartment while Ms. Dunbar, who resided in the same apartment throughout her tenancy under the Lease, testified at her deposition that the unit had only two bedrooms.  This discrepancy is not material to the determination of whether LHA is entitled to summary judgment on the issue of dischargeability.

[4] The Lease stated that if any member of the household failed to "physically occupy the leased premises as his or her principal residence for at least nine (9) months during any twelve (12) month period unless good cause is shown …," Ms. Dunbar was to remove such person from the Lease within thirty (30) days of the end of the nine month absence.

3

other son, Tremain, was not listed as a household member during these years.

In addition to the annual review of the rent and members of the household, the Lease called for Ms. Dunbar to inform LHA whenever her income or that of any member of her household increased by 10% or more. Although she was not required to report decreases in income, the Lease permitted Ms. Dunbar to request a readjustment of her rent when her household income decreased. Ms. Dunbar did in fact report decreases in income in order to seek rent reductions. At her deposition she stated she requested these reductions whenever she was laid off from her seasonal job as a school bus driver for a company called First Student.

In her February 2008 Application for Continued Occupancy, Ms. Dunbar certified to LHA that she was self-employed as a hairdresser and that she also worked as a bus driver for First Student. In that Application Ms. Dunbar identified Takai as a full-time student. Because of his status as a full-time student, Takai's income, although required to be disclosed, was not included in the household income for the purpose of calculating Ms. Dunbar's rent.[5]

Takai graduated from high school in 2008.[6] On September 3, 2008 he began working for the Kinney Shoe Corporation (also referred to as Foot Locker US) at one of its retail stores. During 2008 he earned $913.76 from his job with Foot Locker but Ms. Dunbar did not report this income to LHA.

In her February 2, 2009 Application for Continued Occupancy, Ms. Dunbar certified to LHA that she and Takai were both working and while Ms. Dunbar did not state where Takai was

---

[5] *See* 760 Code Mass. Reg. 6.05(3)(k).

[6] Ms. Dunbar testified at her deposition only that he graduated in 2008. While it is likely that he graduated in May or June of that year, I have no competent evidence of his actual graduation date before me.

4

working, she submitted paystubs showing only his employment at CVS.  At the time, Takai was employed by CVS and Foot Locker.  In addition, in September 2009 Talai began working at Gamestop.  During 2009 he received income of $2,110.07 from Foot Locker and $3,379 from Gamestop, none of which was reported to LHA.  As with her other Applications for Continued Occupancy, Ms. Dunbar signed her February 2009 Application under the pains and penalties of perjury.

At her deposition Ms. Dunbar testified that during 2008, 2009, and 2010, she spent most of her time at her boyfriend's house and had very little knowledge of where Takai worked and how much income he was receiving.  She stated that she asked Takai for his last four paystubs and she took whatever he gave her to LHA.  She said she never questioned him about other employment he might have had and he did not tell her about income from his various other jobs.

In the summer of 2009 Ms. Dunbar requested that her rent be lowered because her income had decreased.  She informed LHA that she was not driving a school bus for First Student that summer.  On July 13, 2009, Ms. Dunbar wrote a note to LHA saying that she was receiving only unemployment compensation but if "at any time I should be able to earn exclusion earnings I will notify LHA."[7]  The record indicates that during the summer of 2009 Ms. Dunbar received paychecks from First Student, two of which appear to have been issued on July 3rd and July 10th, prior to her July 13th note to LHA.  The record indicates that Ms. Dunbar earned a total of $1,603.54 from First Student during the months of July and August 2009.  None of this income was reported to LHA.

---

[7] Although neither party addressed Ms. Dunbar's use of the term "exclusion earnings," the logical inference is that if Ms. Dunbar were to earn income that was *not* excludable from household income for the purpose of calculating her rent, she would let LHA know.

5

At her deposition Ms. Dunbar testified that while receiving unemployment compensation she may have worked occasionally for First Student, but she maintained that she did not work the summer of "the year that I had to sign a paper saying that if I worked I would have to let the Housing Authority know." In her deposition testimony she does not pinpoint the year to which she is referring with any greater specificity.

In 2010 Takai earned $14,251.99 from his Gamestop employment in addition to his earnings from CVS. Only his CVS paystubs were submitted by Ms. Dunbar to LHA in 2010.

Ms. Dunbar did not list Tremain in her February 2, 2010 certification to LHA. As noted, the 2008, 2009 and 2010 addenda to the Lease do not include Tremain as a member of her household. Although neither party has provided any evidence as to when Ms. Dunbar notified LHA that Tremain was not living with her, at her deposition Ms. Dunbar testified that Tremain had not lived with her since approximately 2002 when he turned 18 years of age. She testified that Tremain was homeless and used her address as his mailing address. LHA alleges that in 2010 Tremain lived with Ms. Dunbar and earned $4,721.75 in unreported income from his employment with Nouria Energy Retail.

The parties have stipulated that Ms. Dunbar's annual rent was lower than it would have been had she disclosed to LHA all of her sons' income from their various jobs, although the stipulation does not indicate what years are implicated.

By letter dated October 25, 2010, LHA notified Ms. Dunbar of the discrepancies in her household income that LHA had discovered for the period from July 2008 through June 2010 and demanded that she pay back rent of $7,632.00. Following the receipt of LHA's October 25, 2010 letter, Ms. Dunbar's former attorney had some conversations with LHA which resulted in his

6

sending LHA additional W-2 statements for Ms. Dunbar and Takai which the parties stipulated evidenced "even more income" than previously disclosed.[8]

In a notice dated January 6, 2011, LHA terminated the Lease although Ms. Dunbar testified at her deposition that she had vacated the LHA apartment before then and had given LHA notice of her termination of the Lease.[9] Shortly thereafter LHA commenced a summary process eviction action against her in the Worcester Housing Court.  Ms. Dunbar filed her chapter 13 bankruptcy petition on March 9, 2011, while the eviction proceeding was pending.

## Summary Judgment Standard

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of a material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 65(c), made applicable by Fed. R. Bankr.P. 7056. A "genuine" issue is one supported by such evidence that "a reasonable jury, drawing favorable inferences," could resolve in favor of the nonmoving party. *Triangle Trading Co. v. Robroy Indus., Inc.,* 200 F.3d 1, 2 (1st Cir.1999) (quoting *Smith v. F.W. Morse & Co.,* 76 F.3d 413, 427 (1st Cir.1996)). "Material" means that a disputed fact has "the potential to change the outcome of the suit" under the governing law if the dispute is resolved in favor of the

---

[8] It is unclear whether the agreed upon fact that Ms. Dunbar and Takai earned "even more income" than Ms. Dunbar disclosed refers to the additional amounts LHA found through its verification or whether Ms. Dunbar disclosed even more income than LHA had discovered.  Her memorandum in opposition to LHA's summary judgment motion suggests it is the latter but arguments of counsel in briefs are not evidence for summary judgment purposes.  *Bonardi v. Bonardi (In re Bonardi)*, 2006 WL 1366942, at *1 (Bankr. D. Mass. May 16, 2006).   This ambiguity is not relevant to deciding LHA's summary judgment motion.

[9] The date on which Ms. Dunbar vacated the premises or terminated the Lease, although relevant to the issue of the amount of rent she may owe, is not relevant to the determination of whether her debt to LHA is nondischargeable.

7

nonmovant. *McCarthy v. NW. Airlines, Inc.* 56 F.3d 313, 314–15 (1st Cir.1995). The moving party bears the initial responsibility of informing the court of the basis for its motion and "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[A] party seeking summary judgment always bears the initial responsibility of informing the ... court of the basis for its motion, and ... [must] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Only if the record, viewed in that manner and without regard to credibility determinations, reveals no genuine issue as to any material fact may the court enter summary judgment." *Cadle Co. v. Hayes*, 116 F.3d 957, 959 (1st Cir. 1997).

## Discussion

In its complaint LHA asserts that Ms. Dunbar's liability to it is nondischargeable under both Bankruptcy Code § 523(a)(2)(A) and § 523(a)(2)(B). Section 523(a)(2)(A) of the Bankruptcy Code makes nondischargeable "any debt ... for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." Bankruptcy Code § 523(a)(2)(B) excepts from discharge a debt to the extent obtained (1) by the use of a written statement (2) that is materially false (3) with respect to the debtor's or an insider's financial condition (4) provided the creditor reasonably relied on the false statement in establishing the debt; and (5) the debtor caused to be made or published the false statement with the intent to deceive the creditor.

8

Sections 523(a)(2)(A) and (B) are mutually exclusive. By its very language § 523(a)(2)(A) is inapplicable to a statement respecting the debtor's or an insider's financial condition. *Danvers Savings Bank v. Alexander (In re Alexander)*, 427 B.R. 183, 195 n.11 (Bankr. D. Mass. 2010). "These two subsections of § 523(a) were enacted to address distinct factual situations." *Douglas v. Kosinski (In re Kosinski)*, 424 B.R. 599, 608 (1st Cir. B.A.P. 2010). *See also Palmacci v. Umpierrez*, 121 F.3d 781, 789 (1st Cir. 1997). Therefore, to determine which subsection of § 523(a)(2) has applicability to the facts currently before me, I must decide whether the paystubs provided by Ms. Dunbar to LHA and her periodic verification through her annual Applications for Continued Occupancy fall under the rubric of "a statement respecting the debtor's or an insider's financial condition."

The Bankruptcy Code does not define what is a statement "regarding the debtor's or an insider's financial condition." The approaches taken by courts generally fall into two categories: the "broad" approach which includes any statement that has a bearing on the financial condition of the debtor and the "narrow approach which includes "only statements providing information as to a debtor's net worth, overall financial health, or an equation of assets and liabilities." *Id.* at 608-09. *Kosinski* noted that "[t]he First Circuit has not adopted either approach, and courts within the circuit have applied different interpretations." *Id.* at 609 n.10 (citations omitted). But as the Bankruptcy Appellate Panel concluded in *Kosinski*, I refrain from adopting a specific approach because the result would be the same regardless of the approach taken. *See also Norcross v. Ransford (In re Ransford)*, 202 B.R. 1, 5 (Bankr. D. Mass. 1996), where Judge Boroff eschews a category-based analysis in favor of examining the statement and the purpose for which the statement is sought and made.

9

In this case there can be no doubt that the Application for Continued Occupancy and accompanying paystubs were intended by Ms. Dunbar to reflect the then current state of her income and were submitted for the purpose of establishing her financial eligibility for subsidized housing. Thus the matter at hand involves a statement in writing regarding the debtor's financial condition and so § 523(a)(2)(A) is eliminated and § 523(a)(2)(B) remains the only count upon which LHA may proceed.

Ms. Dunbar does not contest that LHA reasonably relied on her financial statements as required by § 523(a)(2)(B)(iii). Rather she claims that she did not know they were false, § 523(a)(2)(B)(ii), and that she had no intent to deceive LHA as required by § 523(a)(2)(B)(iv).

At her deposition, Ms. Dunbar testified that she had no knowledge of Takai's employment situation because she spent most of her time during 2008, 2009 and 2010 at her boyfriend's house. She testified she did not ever see him wearing any kind of uniform or outfit that might indicate he was working at other jobs in addition to his work at CVS.

Ms. Dunbar, however, does not deny that she earned $1,603.54 of unreported income during the summer of 2009 driving a bus for First Student. There is no question that the omission of this information, coupled with the underreporting of Takai's earnings is a materially false statement under § 523(a)(2)(B)(i) since an omission can be materially false when there is an obligation to proffer the omitted information. *Shawmut Bank, N.A. v. Goodrich (In re Goodrich)*, 999 F.2d 22, 25 (1st Cir. 1993). *See also Morgan County Hsg. Auth. v. Ketcham (In re Ketcham)*, 2005 WL 2209231 (Bankr. C.D. Ill. July 5, 2005) (debtor's failure to report his disabled son's social security income that he began receiving three years after the debtor had qualified for housing assistance but while she was still

10

living in subsidized housing so that she received $3,532 in housing assistance payments to which she was not entitled was a materially false statement); *Missouri Div. of Family Services v. Jones (In re Jones),* 37 B.R. 195 (Bankr. E.D. Mo. 1984); (debtor's failure to inform welfare agency she obtained employment so that she received $497.00 in benefits that should have terminated upon her employment was a materially false statement); *Adult & Family Services Div. of State of Oregon v. Berry (In re Berry)*, 3 B.R. 430 (Bankr. D. Ore. 1980 (debtor's failure to inform welfare agency that her husband was employed so that she received $4,064.82 in benefits to which she was not entitled was a materially false statement). Moreover, the omission is material because it resulted in Ms. Dunbar's annual Applications for Continued Occupancy being substantially untrue. *In re Mann*, 40 B.R. 496, 499 (Bankr. D. Mass. 1984) ("[A] materially false financial statement is one containing an important and substantial untruth.").

But when asked to infer scienter at the summary judgment stage of a proceeding, a court must proceed with care. In *Accardi v. Bartel (In re Bartel)*, 2008 WL 5396485 (Bankr. D. Mass. Dec. 23, 2008), creditors challenged both the dischargeability of their debt under Bankruptcy Code § 523(a)(2)(A) and the debtor's right to receive a discharge under § 727(a)(4)(A). In addressing whether an inference of intent to defraud was appropriate Judge Rosenthal cautioned:

> In order to prevail on their counts under § 523(a)(2)(A) and § 727(a)(4)(A), the plaintiffs will have to establish scienter and fraudulent intent, and they will seek to do so by inference from circumstantial evidence. When faced with an attempt to establish scienter or specific intent on summary judgment by inference, litigants and courts should keep ever before them a basic rule of summary judgment practice—that "all reasonable inferences from the facts must be drawn in the manner most favorable to the nonmovant," *In re Varrasso,* 37 F.3d 760, 763 (1st Cir.1994)—and the consequent guidance from *Varrasso:* "[S]ummary judgment is inappropriate if inferences are necessary for the judgment and those inferences are not mandated by the record." *Id.*

11

>Undisputed facts do not always point unerringly to a single, inevitable conclusion. And when facts, though undisputed, are capable of supporting conflicting yet plausible inferences—inferences that are capable of leading a rational factfinder to different outcomes in a litigated matter depending on which of them the factfinder draws—then the choice between those inferences is not for the court on summary judgment.

>*Id.* Despite these strictures, state-of-mind issues *can* be resolved at the summary judgment stage, provided the circumstantial evidence "is sufficiently potent to establish fraudulent intent beyond hope of contradiction." *Id.* at 764; *In re Marrama,* 445 F.3d 518, 522 (1st Cir.2006) ("Evidence of fraud is conclusive enough to support summary judgment in a § 727(a)(2)(A) action when it yields no plausible conclusion but that the debtor's intent was fraudulent."). Still, "courts must be exceptionally cautious in granting *brevis* disposition in such cases ... especially where ... the movant bears the devoir[10] of persuasion as to the nonmovant's state of mind. *Id.* at 764.

*Bartel*, 2008 WL 5396485, at *2.

At her deposition when questioned about her summer income from First Student and how her rent was calculated, Ms. Dunbar and LHA's attorney engaged in the following exchange:

>Q: While you were receiving unemployment every summer, I'm talking about 2008, 2009 and 2010, were you working anywhere else at the time when you were receiving unemployment?
>
>A: Working anywhere else?
>
>Q: Yes.  Besides receiving unemployment you were not picking up extra shifts anywhere or anything?
>
>A: Well, sometimes during the summer they might ask me to do a route.
>
>Q: First Student?
>
>A: Yes.
>
>Q: So during the summer while you were receiving unemployment you may have done a route for First Student at times?

---

[10] Devoir means duty.  BLACK'S LAW DICTIONARY (9th ed. 2009).

12

A: Yes, at times. I don't think I did any that year.

Q: What year are you talking about?

A: The year that I had to sign a paper saying that if I worked I would have to let the Housing Authority know. I didn't work that summer.

Q: In other summers, maybe 2009, 2010 you may have done a shift or two or route or two for First Student?

A: I don't know.

…

Q: When you did pick up a route during the summer for First Student, did you disclose that information to the Housing Authority?

A: Probably not.

…

Q: You realize your rent was based on your annual income?

A: No.

Q: You didn't know that?

A: No. I had been living in Leominister Housing for 20 years. Never, ever, ever, ever did they ask us for our income tax. Never did they ask for that. It's not – it would be an incorrect calculation if they did it that way. It would be totally incorrect. It would be totally asinine if they did it that way.

Q: But what I'm asking you is, according to the lease and everything else we've seen here today your rent was calculated based upon your annual income, correct?

A: I don't know. I thought it was based on my pay stubs.

Ms. Dunbar's testimony here and her testimony concerning her lack of knowledge as to Takai's employment status establish the existence of a genuine issue of material fact yet to be determined, namely whether Ms. Dunbar intended to deceive LHA by her materially false financial statement. A trial will be necessary to resolve this issue.

**Conclusion**

For the foregoing reasons, LHA's motion for summary judgment is DENIED with respect to count I of the complaint and pursuant to Fed. R. Civ. P. 56(f)(1), made applicable to this proceeding by Fed. R. Bankr. P. 7056, summary judgment will enter for the defendant on count I of the complaint. LHA's motion for summary judgment is DENIED with respect to count II of the complaint which will be scheduled for trial solely on the issue of the debtor's intent to deceive.

At Worcester, Massachusetts this 21st day of June, 2012.

By the Court,

_/s/ Melvin S. Hoffman_

Melvin S. Hoffman
Bankruptcy Judge

cc: Courtney E. Mayo, Esq.
 Hassett & Donnelly
 Worcester, MA 01608
 Counsel for Leominster Housing Authority

 Thomas J. Moran, Jr., Esq.
 Office of Thomas J. Moran, Jr.
 Leominster, MA
 Counsel for Debra Ann Dunbar

14